UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
In re:

Case No: 14-73640-las

HAROLD ADAMO, JR.,

Chapter 11

Debtor.
--------------------------------------------------------x

## MEMORANDUM DECISION AND ORDER

### I.    Introduction

On September 30, 2008, Rocco and Josephine Marini (the "Marinis") brought an

action in the United States District Court for the Eastern District of New York (the

"District Court") against Harold Adamo, Jr. (the "Debtor"), his wife Lisa Adamo ("Lisa"),

The Bolton Group, Inc. ("Bolton Group") and H. Edward Rare Coins and Collectibles, Inc.

("H. Edward") alleging claims under section 10(b) of the Securities Exchange Act of 1934, 15

U.S.C. § 78j(b) (the "section 10(b) claims"), as well as state law claims for fraud, breach of

fiduciary duty, unjust enrichment, and money had and received, in connection with the sale

of rare coins by the Debtor to the Marinis (the "District Court Action").[1]  The Marinis

sought to recover out of pocket losses of $11,304,079, plus interest, and punitive damages.

On February 6, 2014, after roughly six years of litigation, the District Court decided

in favor of the Marinis.[2]  Thereafter, on April 16, 2014, the District Court entered

judgment (the "Judgment") on all counts against the Debtor, H. Edward and Bolton Group

in the sum of $11,304,079, plus (i) prepetition interest calculated at 9% from January 1,

2005 to April 16, 2014 on the state law claims and 9% interest from April 5, 2006 to April

---

[1] See Rocco Marini, Josephine Marini and T & R Knitting Mills, Inc. v. Harold Adamo, Jr., Lisa Adamo, The
Bolton Group, Inc., H. Edward Rare Coins & Collectibles, Inc., No. 08-cv-3995 (E.D.N.Y.).

[2] See Memorandum and Order dated February 6, 2014, No. 08-cv-3995 [Dkt. No. 234].

16, 2014 on the section 10(b) claims, and (ii) post-judgment interest on all claims to be calculated pursuant to the federal rate set forth in 28 U.S.C. § 1961 (the "<u>Judgment Debt</u>"). The District Court, however, dismissed the unjust enrichment and money had and received claims that the Marinis brought against Lisa.

On August 6, 2014, the Debtor filed this chapter 11 case, thus staying all collection efforts on the Judgment pursuant to 11 U.S.C. § 362(a). The Debtor listed the Judgment Debt in Schedule F to his chapter 11 petition as disputed and in the amount of $20,000,000.[3] The Judgment Debt accounts for approximately 94% of the unsecured claims filed or scheduled[4] by the Debtor in this case, and is by far the largest unsecured claim lodged against the Debtor.

Now before the Court is the motion (the "<u>Motion</u>") [Dkt. No. 78] of the Marinis to convert the chapter 11 case of the Debtor to a case under chapter 7 for cause under 11 U.S.C. § 1112(b)(1). The Marinis contend that "cause" exists to convert this case pursuant to 11 U.S.C. § 1112(b)(4)(A) based on a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation. The Marinis also contend that cause exists under 11 U.S.C. § 1112(b)(4)(J) due to the Debtor's unexcused failure to file a plan of reorganization and disclosure statement. On those bases and others, the Marinis argue that the case should be converted.

The Debtor filed opposition to the Motion (the "<u>Opposition</u>") [Dkt. No. 109] and the Marinis filed a reply (the "<u>Reply</u>") [Dkt. No. 113]. The Court held an evidentiary hearing on

---

[3] Although the Marinis have yet to file a proof of claim in this case, they have asserted that, as of April 16, 2014 (the date of entry of the Judgment), the Judgment Debt aggregated $20,756,994.21 and, as of August 6, 2014 (the chapter 11 filing date), the Judgment Debt aggregated $20,764,705.68. *See Rocco Marini and Josephine Marini v. Harold Adamo*, Adv. Pro. No. 15-8008 [Adv. Dkt. No. 1 Complaint].

[4] To date, the total amount of the general unsecured claims filed by creditors or scheduled by the Debtor is $21,200,748.35. A claims bar date has not been set in this case.

the Motion on June 29, 2015.  Thereafter, the Marinis and the Debtor each submitted

proposed findings of fact and conclusions of law [Dkt. Nos. 226 and 227] and written closing

statements [Dkt. Nos. 228 and 230].  The Court then took the matter under advisement.

For the reasons set forth below, the Court concludes that the Marinis have failed to meet

their burden of proof that cause exists under 11 U.S.C. §§ 1112(b)(1) and 1112(b)(2) to

convert this case.  The Motion, therefore, will be denied.

**II.    Jurisdiction**

The Court has jurisdiction over this contested matter under 28 U.S.C. § 1334 and

the Standing Order of Reference entered by the United States District Court for the

Eastern District of New York pursuant to 28 U.S.C. § 157(a), dated August 28, 1986, as

amended by Order dated December 5, 2012, effective *nunc pro tunc* as of June 23, 2011.

This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) because it concerns the

administration of a bankruptcy estate.  A bankruptcy judge may hear and finally decide

any core proceeding.  28 U.S.C. § 157(b)(1).  A motion to convert "stems from the

bankruptcy itself," and may constitutionally be decided by a bankruptcy judge.  *Stern v.

Marshall*, 131 S. Ct. 2594, 2618 (2011).  Accordingly, the Court may enter a final decision

and order adjudicating this matter.

**III.    Procedural History**

**A.    The Chapter 11 Case**

The Debtor filed for chapter 11 relief on August 6, 2014 (the "Petition Date") [Dkt.

No. 1].  In his affidavit filed in accordance with Rule 1007-4 of the Local Bankruptcy Rules

of this Court, the Debtor stated that he could not afford to bond the Judgment pending

appeal, and that the chapter 11 case was filed to stay what he perceived as "highly

aggressive" collection efforts by the Marinis.  *See* Debtor's E.D.N.Y. LBR 1007-4 Affidavit,

at 2 [Dkt. No. 2].  The Debtor further stated that prior to the commencement of the chapter

11 case, the Marinis served approximately eighty information subpoenas upon various third parties, including the Debtor's business associates, his children's schools, banks and one of his neighbors, seeking information to assist in the collection of the Judgment Debt. These efforts, the Debtor asserts, were designed to harass and embarrass him and his family. *Id.*

During the chapter 11 case, to obtain information regarding the Debtor's financial condition, assets and liabilities, the Marinis obtained from this Court more than thirty orders granting them authorization, pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), to issue subpoenas for the production of documents and to examine the Debtor and Lisa, their adult children, Francesca and Nicholas, third parties with whom the Debtor and/or his business entities transacted business, and companies which issued insurance policies to the Debtor.

On January 12, 2015, the Marinis commenced an adversary proceeding against the Debtor seeking a determination that the Judgment Debt is nondischargeable under sections 523(a)(2)(A), (4) and (6) of the Bankruptcy Code. [Adv. Pro. No. 15-8008, Adv. Dkt. No. 1, Complaint]. The Debtor filed an answer to the complaint on February 19, 2015. [Adv. Dkt. No. 10]. On November 11, 2015, the Marinis filed a motion for summary judgment arguing that under the doctrine of collateral estoppel, the Debtor is precluded from relitigating facts previously litigated in the District Court Action which were necessary to the outcome of that litigation and that findings made by the District Court establish that the Judgment Debt is nondischargeable under sections 523(a)(2)(A), (4) and (6) of the Bankruptcy Code. [Adv. Dkt. Nos. 36 and 37]. On December 19, 2015, the Debtor filed opposition papers to the Marinis' summary judgment motion [Adv. Dkt. Nos. 40 and 41], and on January 19, 2016, the Marinis filed a reply memorandum in further support of its motion for summary judgment [Adv. Dkt. No. 43]. The summary judgment motion is currently pending before the Court.

4

**B.     Stay Relief and the Appeal**

On April 17, 2014, the Debtor appealed the decision of the District Court to the

Court of Appeals for the Second Circuit (the "Appeal") [2d Cir. Dkt. Case No. 14-1205].  The

Marinis filed a cross-appeal with respect to the dismissal by the District Court of their

claims against Lisa (the "Cross-Appeal") [2d Cir. Dkt. Case No. 14-1706].

On August 6, 2014, upon filing for relief under chapter 11, the Appeal and the

Marinis' efforts to collect on the Judgment were automatically stayed under 11 U.S.C.

§ 362(a).  On August 28, 2014, the Second Circuit granted the Debtor's motion to stay both

the Appeal and the Cross-Appeal as a result of his having commenced this chapter 11 case.

On August 29, 2014, the Marinis sought clarification from the Second Circuit as to whether

the Cross-Appeal against Lisa could go forward since she did not seek protection under the

Bankruptcy Code (the "Clarification Motion").  On September, 17, 2014, the Second Circuit

denied the Clarification Motion, ruling that both the Appeal and the Cross-Appeal were

stayed.

On October 2, 2014, the Debtor filed a motion in this Court to modify the automatic

stay imposed under section 362(a) of the Bankruptcy Code for cause under section 362(d)(1)

and the factors set forth in *In re Sonnax Indus., Inc.*, 907 F.2d 1280 (2d Cir. 1990) (the

"Sonnax factors") to allow him to proceed with his Appeal (the "Stay Relief Motion") [Dkt.

No. 33].  On October 21, 2014, the Marinis filed opposition [Dkt. No. 53] to the Stay Relief

Motion arguing that application of the Sonnax factors weighed against lifting the stay with

respect to the Debtor's Appeal, but sought to obtain a ruling that the automatic stay does

not apply to Lisa such that the Marinis' Cross-Appeal may go forward.  The Court held a

hearing on the Stay Relief Motion on October 28, 2014.  During the hearing, the Debtor

advised the Court of his intention to file a motion under section 1112(b) of the Bankruptcy

Code to dismiss his chapter 11 case and requested that the Stay Relief Motion be carried on

5

the Court's calendar until resolution of the motion to dismiss.  The motion to dismiss was filed on November 5, 2014 ("Motion to Dismiss").  On December 1, 2014, the Debtor filed a notice seeking to withdraw the Motion to Dismiss.  At a hearing before the Court on December 4, 2014, Debtor's proposed bankruptcy counsel, Tartar Krinsky & Drogin LLP ("TKD"), withdrew its application to be retained as counsel to the Debtor in the chapter 11 case.[5]  Because TDK withdrew its counsel retention application, the Stay Relief Motion was marked off the Court's calendar and the Debtor was given a reasonable opportunity to find substitute bankruptcy counsel.  Thereafter, on February 12, 2015, the Motion to Dismiss was likewise marked off the Court's calendar because of TKD's withdrawal of its application to be retained as Debtor's counsel.

On February 19, 2015, the Debtor, through substitute bankruptcy counsel, filed a second motion for relief from the automatic stay (the "Second Stay Relief Motion") [Dkt. No. 120] for cause under section 362(d)(1) and the Sonnax factors for the limited purpose of pursuing his Appeal.  The Marinis opposed the Second Stay Relief Motion [Dkt. No. 129].  After a hearing held on March 10, 2015, and by Order dated April 20, 2015 [Dkt. No. 171], the Court granted the Second Stay Relief Motion finding that the Debtor demonstrated sufficient cause under section 362(d)(1) in accordance with the relevant Sonnax factors.

On April 23, 2015, the Second Circuit entered an order lifting the stay of the Appeal and Cross Appeal and setting a briefing schedule.  Initial briefs were filed and the Debtor's reply brief was due September 25, 2015.  On September 11, 2015, the Debtor filed an application with this Court seeking to retain Catafago Fini LLP as new appellate counsel

---

[5] Debtor had initially sought to retain TKD as his bankruptcy counsel but on December 4, 2014, TKD withdrew its counsel retention application as a result of the objection of the United States Trustee ("U.S. Trustee") to TKD's concurrent representation of Lisa, the Debtor's children, and the entities to whom the Debtor had allegedly transferred his interest in certain real properties before commencing the chapter 11 case.

*nunc pro tunc* to September 3, 2015 [Dkt. No. 243]. The Marinis objected to the retention of new appellate counsel [Dkt. No. 248]. A hearing on the retention application was held before the Court on September 22, 2015. By order dated September 30, 2015 [Dkt. No. 249], the Court authorized counsel's retention. According to the Debtor, the Appeal has been fully submitted and the parties are awaiting the scheduling of oral argument or a decision by the Second Circuit.[6]

### C.    The Motion to Convert

On January 6, 2015, the Marinis filed this Motion to convert the chapter 11 case to a case under chapter 7 for cause under section 1112(b)(1) of the Bankruptcy Code because the Debtor is using the bankruptcy process to frustrate the Marinis' judgment collection efforts, relitigate issues previously decided by the District Court and avoid posting a supersedeas bond. The Marinis also argue that, given the current debt structure, the Debtor does not have a reasonable expectation of confirming a plan. The Marinis contend that the Debtor's expenses far exceed the revenue generated by his business, and consequently his income is insufficient to meet his ongoing obligations. This, in the view of the Marinis, evidences a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation sufficient for this Court to find cause to convert the chapter 11 case under section 1112(b)(4)(A) of the Bankruptcy Code. In addition, the Marinis allege that prior to commencement of the chapter 11 case, in an effort to thwart collection of the Judgment Debt, the Debtor transferred his interest in several parcels of real property, all of which should be brought back into the bankruptcy estate on a fraudulent transfer theory and liquidated to pay creditor claims. The Marinis also allege that the Debtor has failed to

---

[6] *See* Declaration of Harold Adamo [Dkt. No. 259] at 3, ¶ 10, in opposition to the motion by the Marinis seeking authority to prosecute certain claims on behalf of the Debtor's bankruptcy estate [Dkt. No. 254].

disclose additional assets which too may be liquidated to pay creditor claims.  Lastly, the Marinis assert that cause to convert this chapter 11 case exists under section 1112(b)(4)(J) of the Bankruptcy Code because the Debtor failed to file a disclosure statement or plan within the time fixed by the Bankruptcy Code or by an order of the Court.

From the Marinis' perspective, conversion of this chapter 11 case to a case under chapter 7 is warranted because the Debtor's pre- and post-petition conduct belies any notion that he will suddenly reveal undisclosed assets or conduct an investigation as to the validity of certain prepetition asset transfers.  The Marinis, holders of more than 90% of the debt in this case, are at a loss as to why the Debtor should be permitted to use chapter 11 to maintain his purported extravagant lifestyle while at the same time refuse to pay creditor claims.

The Debtor, as one would expect, has a different view.  On February 5, 2015, the Debtor filed his Opposition[7] to the Motion arguing that the Marinis have failed to demonstrate cause to convert this case because he "continues to honor [his] obligations under [c]hapter 11, there has not been a substantial or continuing loss, (he) maintains insurance, and has complied with orders of the court."  Opposition, at 5.  In support of his argument that cause does not exist to convert the case, the Debtor states that his monthly operating reports ("MORs") filed with the Court do not reflect a substantial or continuing

---

[7] On January 14, 2015, the Debtor filed an application [Dkt. No. 92] to retain the law firm of Platzer, Swergold, Levine, Goldberg, Katz & Jaslow, LLP ("Platzer Swergold") as substitute bankruptcy counsel.  On January 16, 2015, Platzer Swergold filed a letter [Dkt. No. 95] requesting an adjournment of, *inter alia*, the hearing on the Motion for approximately three weeks to allow its retention application to be considered and approved by the Court, provide sufficient time to transition the files from TKD, and prepare a response to the Motion and other motions filed by the Marinis in the chapter 11 case.  By letter dated January 21, 2015 [Dkt. No. 102], the Marinis opposed the requested adjournment arguing that it was nothing more than a delay tactic, and asserted that they should not be prejudiced because the Debtor took what the Marinis believed was an inordinate amount of time to retain substitute bankruptcy counsel.  After considering the letters, the Court adjourned the hearing on the Motion.  Platzer Swergold's retention was subsequently approved *nunc pro tunc* to January 14, 2015 by order dated March 23, 2015 [Dkt. No. 142].  Thereafter, the parties agreed to adjourn the hearing on the Motion to June 29, 2015.

loss to or diminution of the estate.  Rather, the MORs exhibit positive cash flow for most of the reporting months and on an aggregate basis.  Answering the claim that chapter 11 should not be used to thwart judgment collection efforts and avoid the requirement of a supersedeas bond, the Debtor argues that courts have permitted a debtor to remain in chapter 11 to stay enforcement of a creditor's judgment pending appeal of the judgment. In support of this argument, the Debtor cites *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1 (1987) and *In re Sletteland*, 260 B.R. 657 (Bankr. S.D.N.Y. 2001).  The Debtor also argues that should the Court find cause under section 1112(b)(1), it should refrain from converting the case because conversion would not be in the best interest of creditors and the estate as it would add unnecessary litigation costs and uncertainty to the case.  The Debtor maintains that he would oppose a sale of estate assets by any trustee appointed in a chapter 7 case insisting that any sales would have to be "undone" should the Debtor prevail on the Appeal.

On February 10, 2015, the Marinis filed the Reply in further support of the Motion. In the Reply, the Marinis contend that the Debtor's monthly expenses exceed his monthly income by a considerable amount, and his luxurious lifestyle continues to result in a loss to or diminution of the bankruptcy estate thereby constituting cause to convert the chapter 11 case under section 1112(b)(4)(A) of the Bankruptcy Code.  Comparing the Debtor's monthly credit card expenses to his monthly revenue,[8] the Marinis calculated, that at a minimum, the Debtor was spending $15,761 each month while earning only $7,500 in income.  The result, a monthly deficit of $8,261.  This deficit, the Marinis contend, does not include payments for the Debtor's boat and marina expenses, country club membership and vacation expenses.  Accounting for those expenses only serves to increase the spread between the Debtor's monthly income and expenses.  According to the Marinis, the Debtor

---

[8] *See* Reply, at 11, Table 1: Minimum Monthly Expenses vs. Income.

and Lisa testified at their respective Bankruptcy Rule 2004 examinations that they incurred additional expenses not shown on their credit card statements. When those expenses are included in the monthly income and expense calculation, the Debtor's estimated monthly expenses are roughly $26,354,[9] an amount well in excess of his reported monthly income of $7,500. Also, the Marinis allege that the Debtor has unreported assets, including approximately $4.7 million in cash that the District Court found the Debtor received from the Marinis. The Marinis claim that the Debtor is using the undisclosed cash to pay his expenses and support his extravagant lifestyle. This purported use, the Marinis contend, in itself results in a continuing loss to or diminution of estate assets sufficient to justify conversion of the case. Again, as one would expect, the Debtor steadfastly denies any nondisclosure of assets, including the cash purportedly received from the Marinis.

Apart from their argument that ample cause exists to convert the case by reason of the Debtor's substantial or continuing loss to or diminution of the estate, and the failure to disclose assets, in the Reply the Marinis for the first time argue that the case should also be converted on the ground that it is a bad faith filing. In particular, the Marinis assert that the Debtor's "failure to provide accurate and complete reporting, concealment of assets, ongoing lack of candor with his creditors, and failure to comply with court orders" demonstrates that the Debtor filed for bankruptcy relief in bad faith. Reply, at 26.

### D.    The Evidentiary Hearing and Post-Hearing Submissions

On June 29, 2015, the Court held an evidentiary hearing (the "Evidentiary Hearing") and heard arguments on the Motion. The Debtor served as his own witness at the Evidentiary Hearing, and the parties introduced documentary evidence. The parties

---

[9] *See* Reply, at 14, Table 2: Actual Estimated Monthly Expenses vs. Income.

made post-hearing submissions, including proposed findings of fact and written closing statements, and the Court took the matter under advisement.

The Court has carefully considered the evidence presented at the Evidentiary Hearing, the exhibits admitted into evidence, the parties' briefs and arguments of counsel. This Memorandum Decision and Order will constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, as made applicable to this contested matter by Bankruptcy Rule 9014(c).[10]

## IV.    Facts[11]

The facts found by the Court are as follows[12]:

1.    Debtor is a buyer and seller of rare coins. MX 9.

2.    Debtor founded and operated Bolton Group and H. Edward to sell his rare coins.  MX 9.

3.    The Debtor and Lisa were the sole owners and directors of Bolton Group and H. Edward.  MX 9.

---

[10] To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such, and to the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

[11] The facts are taken from the pleadings, exhibits, transcripts, and other papers submitted by the parties in the bankruptcy case, the record of the Evidentiary Hearing, and the Court's Claims Register.  The Court has taken judicial notice of the contents of the docket in this bankruptcy case.  *Teamsters Nat'l Freight Indus. Negotiating Comm. et al. v. Howard's Express, Inc. (In re Howard's Express, Inc.)*, 151 F. Appx. 46, 48 (2d Cir. 2005) (stating that courts are empowered to take judicial notice of public filings, including a court's docket); *Levine v. Egidi*, No. 93 C 188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993); *Katzenstein v. VIII SV5556 Lender, LLC (In re Saint Vincent's Catholic Med. Ctrs. of N.Y.)*, 440 B.R. 587, 599 (Bankr. S.D.N.Y. 2010) (taking judicial notice of the docket in the underlying bankruptcy case); *In re Campbell*, 500 B.R. 56, 59 n. 7 (Bankr. D.N.M. 2013) (electing to take judicial notice of the entire file in the case for sake of completeness as a bankruptcy court has the inherent authority to take judicial notice of entries on its own docket).  The Court is also permitted to take judicial notice of publicly-filed documents such as those filed on the dockets of other courts.  *Kavowras v. N.Y. Times Co.*, 328 F.3d 50, 57 (2d Cir. 2003) (noting that courts may take judicial notice of public filings); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) ("[C]ourts routinely take judicial notice of documents filed in other courts … to establish the fact of such litigation and relating filings.") (internal citations omitted).

[12] References to the Evidentiary Hearing transcript are noted herein as "Tr." followed by reference to the page number: line number.  References to the exhibits introduced at the Evidentiary Hearing by the Marinis and by the Debtor are noted herein as "MX" and "DX", respectively.  "Debtor Decl." refers to the sworn declaration, dated June 24, 2015, admitted at trial as containing the direct testimony of the Debtor. DX 2.

4.      Bolton Group and H. Edward ceased operations in 2013.  Statement of Financial Affairs [Dkt. No. 19].

5.      Lisa, the nondebtor spouse, is a homemaker.  Schedule I to the Petition [Dkt. No. 18].

6.      The Adamos have five children, two of which are still minors.  Tr. 34:20-25.

7.      On April 16, 2014, the Marinis obtained the Judgment against the Debtor in the sum of $11,304,079, plus (i) prepetition interest calculated at 9% from January 1, 2005 to April 16, 2014 on the state law claims and 9% interest from April 5, 2006 to April 16, 2014 on claims under section 10(b) of the Securities Exchange Act of 1934, and (ii) post-judgment interest on all claims to be calculated pursuant to the federal rate set forth in 28 U.S.C. § 1961.  MX 9.

8.      On April 17, 2014, the Debtor appealed the Judgment to the Court of Appeals for the Second Circuit, and the Appeal is currently pending.  MX 9; 2d Cir. Dkt. No. 14-1205.

9.      The Debtor did not have sufficient funds to post a supersedeas bond for his Appeal.  Motion to Dismiss, at 2; E.D.N.Y. LBR 1007-4 Affidavit, at 2; Debtor Decl. ¶ 10.

10.     The Debtor filed for chapter 11 relief on August 6, 2014.  Petition [Dkt. No. 1].

11.     The Cross Appeal by the Marinis is pending before the Second Circuit. 2d Cir. Dkt. No. 14-1706.

12.     The Debtor listed a qualified profit sharing 401(k) retirement account at E*Trade ("E*Trade Retirement Account") with a value of $471,000 in Schedule B to his chapter 11 petition.  Schedule B [Dkt. No. 18]; Amended Schedule B [Dkt. No. 241].

13.     During the chapter 11 case, the Debtor's E*Trade Retirement Account decreased by $469,000, of which approximately $171,000 was withdrawn by the Debtor to pay his or household expenses.  Tr. 52:20-54:1.

14.     The Debtor claimed the entire value of the E*Trade Retirement Account as exempt property on Schedule C to his chapter 11 petition.  Schedule C [Dkt. No. 18.]

15.     As of the date of the Evidentiary Hearing, the Debtor was current in the payment of chapter 11 fees due to the Office of the United States Trustee.  Tr. 111:25-112:2; Debtor Decl. ¶ 28.

16.     The Debtor is a salaried employee at Bullion Shark, which trades coins and metal bullion.  Tr. 106:24-107:6; Debtor Decl. ¶ 21.

17.     In the spring of 2014, the Debtor transferred Bullion Shark to his son, Nicholas Adamo, who has thus far paid $2,000 for the business.  Tr. 23:9-25:8.

18.     Nicholas Adamo is a full-time law student and works approximately 18 hours a week at Bullion Shark.  Tr. 23:24-24:3.

19.     The Debtor previously had an interest in (i) his family residence located at 207 Benegeyfield Drive, East Williston, New York (the "Residence"); (ii) commercial office space on Willis Avenue, Mineola, New York (the "Willis Avenue Property"), and two parcels of real property located in Bolton Landing, New York (the "Bolton Landing Properties"), one of which one is the Debtors' family vacation home. Statement of Financial Affairs [Dkt. No. 19].

20.     In 2009, the Debtor transferred his interest in the Residence, the Willis Avenue Property and the Bolton Landing Properties to various family limited partnerships.  Statement of Financial Affairs, at 4. [Dkt. No. 19].

21.     On July 31, 2015 and September 9, 2015, the Debtor filed periodic reports under Bankruptcy Rule 2015.3 ("Rule 2015.3 Reports") regarding the operations and profitability of the family limited partnerships in which the estate holds a substantial or controlling interest and the value of those entities as of February 6, 2015 and August 6, 2015.  Rule 2015.3 Reports.[13] [Dkt. Nos. 234, 235, 238, 239 and 240].

22.     The Debtor holds a 1% general partnership interest and a 44% limited partnership interest in the various family limited partnerships which, in turn, own the Residence, the Willis Avenue Property and the Bolton Landing Properties.  Rule 2015.3 Reports; Schedule B; Debtor Decl. ¶¶ 18-19.

23.     Bullion Shark pays the real estate taxes on the Willis Avenue Property where Bullion Shark operates. Tr. 29:6-9; Rule 2015.3 Reports.

24.     In the Rule 2015.3 Reports, the Debtor lists a 1% general partnership interest and a 44% limited partnership interest in H.L.A. Coins Family Limited Partnership with a value of $175,000.  The sole asset of the H.L.A. Coins Family Limited Partnership is a $393,000 loan to another Adamo-related entity, Five Gifts Family Limited Partnership, which was used to purchase the property located at 4783 Lakeshore Drive, Bolton Landing, New York ("4783 Lakeshore Drive Property").  Rule 2015.3 Reports.

25.     The 4783 Lakeshore Drive Property is encumbered by a mortgage held by the related family limited partnership.  Rule 2015.3 Reports.

---

[13] As of the date of the Evidentiary Hearing, the Debtor had not filed the Rule 2015.3 Reports.  The failure to timely file these reports was raised by the Marinis for the first time at the Evidentiary Hearing.  The Debtor maintains that the value of the family limited partnerships was disclosed in his chapter 11 schedules and in the MORs. *See* Schedule B, p. 2 [Dkt. No.18]; Tr. 54:2-6; DX A-J.

26.    The Residence, the Willis Avenue Property, and the real property located at 5518 Lakeshore Drive, Bolton Landing, New York are unencumbered.  Rule 2015.3 Reports.

27.    The Debtor has expended funds to maintain the Residence, the Willis Avenue Property, and the Bolton Landing Properties.  Tr. 115:18-21.

28.    As of the date of the Evidentiary Hearing, the real estate taxes and insurance on the Residence, Willis Avenue Property, and the Bolton Landing Properties are current.  Tr. 115:10-17.

29.    The Debtor is seeking to market and sell the Willis Avenue Property and the 4783 Lakeshore Drive Property. Tr. 109:20-25; 110:1-11; Debtor Decl. ¶ 18.

30.    The Debtor's reason for selling the Willis Avenue Property and the 4783 Lakeshore Drive Property is to create cash for the estate.  Tr. 110:16-18; Debtor Decl. ¶ 20.

31.    The Debtor has filed a motion for an order authorizing him, as general partner of H.L.A. Willis Family Limited Partnership, to execute a contract of sale for the Willis Avenue Property.  [Dkt. No. 266].

32.    The MORs for the period August 2014 to July 2015 list the book value of the Debtor's interest in the family partnerships at $905,000.  [Dkt. Nos. 29, 52, 61, 71, 107, 132, 208, 209, 210, and 214].

33.    The MORs for August 2015 through December 2015 list the book value of the Debtor's interest in the family partnerships at $1,133,000.  [Dkt. Nos. 233, 237, 250, 251, 263, 264, and 265].

34.    The deadline for filing MORs established by the Office of the United States' Operating Guidelines and Reporting Requirements For Debtors in Possession and

Trustees (Revised Nov. 27, 2013) ("U.S. Trustee's Operating Guidelines"), is the 20th of each month for the previous month a debtor is in chapter 11.

35.    With the exception of the August and October 2014 MORs, the Debtor's MORs have consistently been filed after the deadline established by the U.S. Trustee's Operating Guidelines.

36.    The January 2015 MOR was filed on March 9, 2015, the February, March and April 2015 MORs were filed on June 19, 2015, the May and June 2015 MORs were filed several days late, the July 2015 MOR was filed on September 9, 2015, and the August and September 2015 MORs were filed more than two months after the deadline. MORs [Dkt. Nos. 29, 52, 61, 71, 107, 132, 208, 209, 210, 214, 233, 237, 250, and 251].

37.    The Debtor filed his MORs for October, November and December 2015 on February 4, 2016. MORs [Dkt. Nos. 263, 264, and 265].

38.    The MORs show positive cash flow for August 2014, November 2014, January 2014, February 2015, March 2015, May 2015, July 2015 and November 2015. [Dkt. Nos. 29, 71, 107, 132, 208, 209, 214, 237, and 264]; DX A-J.

39.    The MORs show negative cash flow for September 2014, October 2014, December 2014, April 2015, June 2015, August 2015, September 2015, October 2015, and December 2015.  [Dkt. Nos. 52, 61, 210, 233, 250, 251, 263, and 265]; DX A-J.

40.    The end-of-month and beginning-of-month balances listed in the MORs for the reporting period ending May 2015 are not consistent with the amounts set forth in the Debtor's bank statements for similar reporting periods.

41.    The end-of-month and beginning-of-month balances listed in the MORs for the reporting period October 2015 through December 2015 are consistent with the amounts set forth in the Debtor's bank statements for the like reporting period.

42.    The Debtor has not filed a chapter 11 plan or a disclosure statement.

16

43.     Pursuant to section 1121 of the Bankruptcy Code, the one hundred twenty day exclusive period in which only the Debtor may file a chapter 11 plan expired on December 4, 2014.

44.     The Debtor did not move to extend the exclusive period in which he may file a chapter 11 plan.

45.     No deadline has been established by the Court for the filing of a chapter 11 plan and disclosure statement.

## V.     Applicable Legal Standards

Section 1112(b) of the Bankruptcy Code provides that the court shall convert a chapter 11 case to a case under chapter 7 or dismiss a chapter 11 case, whichever is in the best interests of creditors and the estate, for cause, unless the Court determines that one of the two limited exceptions set forth in section 1112(b)(1) and (b)(2) apply.  If one or both of the exceptions apply, the Court has discretion whether to dismiss or convert the chapter 11 case.  Under section 1112(b)(1), rather than dismiss or convert, the Court may determine that the appointment of a trustee or an examiner is in the best interests of creditors and the estate.  11 U.S.C. §§ 1112(b)(1).  Under section 1112(b)(2), the Court may deny a motion to convert or dismiss if (i) it finds and specifically identifies "unusual circumstances establishing that conversion or dismissal is not in the best interests of creditors and the estate" and (ii) the debtor or any other party in interest establishes that the requirements of 11 U.S.C. § 1112(b)(2)(A) and (B) have been met.  11 U.S.C.  § 1112(b)(2).

The Court's analysis begins with an assessment of whether cause exists.  The movant bears the burden of demonstrating, by a preponderance of the evidence, that cause exists to dismiss or convert a chapter 11 case.  *In re Babayoff*, 445 B.R. 64, 76 (Bankr. E.D.N.Y. 2011); *Taub v. Taub (In re Taub),* 427 B.R. 208, 231 (Bankr. E.D.N.Y. 2010).  If cause is found to exist, and the Court determines that the limited exceptions do not apply,

17

dismissal or conversion is mandatory – the Court must dismiss or convert the chapter 11

case.  Courts have broad discretion to determine whether cause exists to dismiss or convert

a chapter 11 case under section 1112(b).  *In re MF Global Holdings Ltd.*, 465 B.R. 736, 742

(Bankr. S.D.N.Y. 2012); *In re FRGR Managing Member LLC,* 419 B.R. 576, 580 (Bankr.

S.D.N.Y. 2009) (*citing In re Kholyavka,* No. 08–10653DWS, 2008 WL 3887653, at *5 (Bankr.

E.D. Pa. Aug. 20, 2008)).

Section 1112(b)(4) of the Bankruptcy Code provides an "illustrative, not exhaustive"

list of sixteen grounds that constitute cause for purposes of section 1112(b)(1) of the

Bankruptcy Code.[14]  *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113

F.3d 1304, 1311 (2d Cir. 1997).  The list is not exclusive, and the Court is free to consider

---

[14] The specific, nonexclusive grounds listed in section 1112(b)(4) are:

| | |
|---|---|
| (A) | substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; |
| (B) | gross mismanagement of the estate; |
| (C) | failure to maintain appropriate insurance that poses a risk to the estate or to the public; |
| (D) | unauthorized use of cash collateral substantially harmful to 1 or more creditors; |
| (E) | failure to comply with an order of the court; |
| (F) | unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; |
| (G) | failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; |
| (H) | failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any); |
| (I) | failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; |
| (J) | failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; |
| (K) | failure to pay any fees or charges required under chapter 123 of title 28; |
| (L) | revocation of an order of confirmation under section 1144; |
| (M) | inability to effectuate substantial consummation of a confirmed plan; |
| (N) | material default by the debtor with respect to a confirmed plan; |
| (O) | termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and |
| (P) | failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition. |

11 U.S.C. § 1112(b)(4).

other factors.  *BH S&B Holdings, LLC*, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010); *FRGR Managing Member LLC*, 419 B.R. at 580.

## VI.    Discussion

The Marinis allege two grounds for conversion under section 1112(b)(4).  They assert that cause to convert this case exists based on (i) a substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation, and (ii) the failure by the Debtor to file a disclosure statement, or to file or confirm a plan, within the time fixed by the Bankruptcy Code or by order of the Court.  11 U.S.C. §§ 1112(b)(4)(A) and 1112(b)(4)(J).  The Court will address each ground in turn.

### A.    *Substantial or Continuing Loss to or Diminution of the Estate and the Absence of A Reasonable Likelihood of Rehabilitation under 11 U.S.C. § 1112(b)(4)(A)*

To prevail under section 1112(b)(4)(A), a movant must satisfy both prongs of section 1112(b)(4)(A), i.e., a substantial or continuing loss to or diminution of the estate <u>and</u> the absence of a reasonable likelihood of rehabilitation.  11 U.S.C. § 1112(b)(4)(A).  *See also FRGR Managing Member LLC,* 219 B.R. at 581; *In re AdBrite Corp.*, 290 B.R. 209, 215 (Bankr. S.D.N.Y. 2003).  The terms "substantial" and "continuing" in section 1112(b)(4)(A) are mutually exclusive.

> By the use of the word "substantial" in section 1112(b)(4)(A), Congress has indicated that a loss need not be continuing in order to satisfy the first prong of this enumerated cause. If the loss is sufficiently large under the financial circumstances of the debtor as to materially negatively impact the bankruptcy estate and interest of creditors, the first prong is demonstrated without a requirement that the loss be continuing.

7 Collier on Bankruptcy ¶ 1112.04[6] (16th ed. rev.).

In determining whether a substantial or continuing loss to, or diminution of, the estate exists, "a court must make a full evaluation of the present condition of the estate, not merely look at the debtor's financial statements."  *AdBrite Corp.*, 290 B.R. at 215 (internal

citation omitted). The existence of a continuing loss to or diminution of the estate can be found where a debtor consistently suffers a post-petition negative cash flow and is unable to pay current expenses. *Id. See also In re Silverstein*, 94 B.R. 284, 288 (Bankr. E.D.N.Y. 1988) (finding a continuing diminution to the estate where each month the debtors have been spending more than they make); *In re 3868-70 White Plains Rd., Inc.*, 28 B.R. 515, 518 (Bankr. S.D.N.Y. 1983). As explained in *AdBrite Corp.*:

> A continuing loss or diminution of the estate may be tolerated where reorganization is feasible and the pattern of unprofitable operations can be reversed as a result of a successful reorganization. The debtor, however, should not continue in control of the business beyond a point at which reorganization no longer remains realistic. The courts must evaluate losses on a case-by-case basis. Small losses over an extended period of time may be acceptable, whereas large losses in a short period may indicate that rehabilitation is not likely.

290 B.R. at 215 (*citing In re Photo Promotion Assocs.*, 47 B.R. 454, 458-59 (S.D.N.Y. 1985)).

Even where a debtor shows positive cash flow, continuing loss to or diminution of the estate can also be established by an "actual depreciation in the value of property of the estate." *In re Quail Farm, LLC*, No. 09–bk–298, 2010 WL 1849867, at *3 (Bankr. N.D. W. Va. May 5, 2010) (*citing In re Tolco Properties, Inc.*, 6 B.R. 482, 486 (Bankr. E.D. Va. 1980)). While it is not unusual for estate assets to decline during the early stage of a chapter 11 case, *Silverstein*, 94 B.R. at 288, a persistent loss during the bankruptcy case comes at the expense of creditors and would weigh in favor of conversion or dismissal of the case. *AdBrite Corp.*, 290 B.R. at 215 (stating that the purpose of section 1112(b) is to "prevent the debtor-in-possession from gambling on the enterprise at the creditors' expense when there is no hope of rehabilitation").

As noted above, in addition to establishing a substantial or continuing loss to or diminution of the estate, the party seeking dismissal or conversion of the case under section 1112(b)(4)(A) must also demonstrate the absence of a reasonable likelihood of

rehabilitation. "Rehabilitation" for purposes of subsection 1112(b)(4)(A) "does not mean the same thing as reorganization for purposes of Chapter 11 because a reorganization may include an orderly or complete liquidation." *AdBrite Corp.*, 290 B.R. at 216. Rather, "[i]n this context, rehabilitation means to put back in good condition and reestablish on a sound basis." *Id.* The debtor must be "reestablished on a secured financial basis, which implies establishing a cash flow from which its current obligations can be met." *Id.*; *Taub v. Adams*, 10-CV-02600 (CBA), 10-CV-02611(CBA), 2010 U.S. Dist. LEXIS 104805, at *37 (E.D.N.Y. Aug. 30, 2010).

Measured against this standard, the Court concludes that the Marinis have failed to demonstrate a substantial or continuing loss to or diminution of the bankruptcy estate sufficient to establish cause under section 1112(b)(4)(A). The Court bases its conclusion on the following.

In support of their argument that the Debtor has suffered substantial or continuing losses or diminution of estate assets, the Marinis cite to the following: (i) a $469,000 loss in the Debtor's E*Trade Retirement Account[15] as indicative of a substantial loss to the bankruptcy estate, and (ii) the MORs which, they claim, show a persistent negative cash flow. In addition, the Marinis contend that (x) the Debtor has undisclosed assets that are being used to support an extravagant lifestyle and pay expenses that far exceed the Debtor's income, and (y) the Debtor has not taken steps to avoid the prepetition transfer of certain real property to the family limited partnerships and consequently has not sought to liquidate any of the real properties.

---

[15] The Marinis raised this argument for the first time at the Evidentiary Hearing.

### i.    The E*Trade Retirement Account

The Marinis point to the Debtor's Schedule B [Dkt. No. 18] and the MORs to show

that the value of the Debtor's E*Trade Retirement Account decreased from $471,000 as of

the Petition Date to $2,000[16] in the months postpetition.  Marinis' Proposed Findings of

Fact and Conclusions of Law, ¶ 63 [Dkt. No. 227].  This, they insist, constitutes a

substantial loss to the estate and establishes cause to convert the case.  In reaching this

conclusion, however, the Marinis assume that (a) the E*Trade Retirement Account is

property of the estate and (b) the account proceeds are available to pay creditor claims.  If

either assumption is incorrect, the Marinis' argument that there has been a substantial loss

to the estate on this ground fails.

Section 541(a) of the Bankruptcy Code states that "[t]he commencement of a case . . .

creates an estate."  11 U.S.C. § 541(a).  The seven numbered paragraphs of section 541(a)

define what constitutes property of a debtor's bankruptcy estate, and section 541(b)

describes what is excluded.  *See* 11 U.S.C. § 541.  Among the exclusions are certain

retirement funds.  *See* 11 U.S.C. § 541(b)(7).  Section 541(b)(7) of the Bankruptcy Code

explicitly <u>excludes</u> ERISA plans and 401(k) contributions from a debtor's estate.  *See*

*Kirschenbaum v. United States Dept. of Labor (In re Robert Plan Corp.),* 777 F.3d 594, 597

(2d Cir. 2015); *In re Egan*, 458 B.R. 836, 843 (Bankr. E.D. Pa. 2011); *In re Njuguna,* 357

B.R. 689, 690 (Bankr. D.N.H. 2006).

Debtor lists the E*Trade Retirement Account in Schedule B to his chapter 11

petition as a "qualified profit sharing in [sic] 401k plan" with a value of $471,000.  If the

---

[16] Debtor attributed the decrease in value to his having used approximately $100,000 to fund living expenses during the chapter 11 case and the balance of the E*Trade Retirement Account was "dissipated by the drop in the [value of the] stock."  Tr. 52:20-54:1.

22

E*Trade Retirement Account is a 401(k) plan account, it is excluded from the estate under section 541(b) of the Bankruptcy Code. The Marinis did not offer any evidence to rebut the Debtor's description on Schedule B of the E*Trade Retirement Account as a 401(k) plan. For this reason, the Court finds no persuasive evidence that the E*Trade Retirement Account constitutes property of the estate under 11 U.S.C. § 541(a).

Even if the Debtor's E*Trade Retirement Account is not subject to exclusion under section 541(b)(7) and constitutes property of the estate, section 522(b)(1) provides that "[n]otwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph (2) or, in the alternative, paragraph (3) of this subsection." 11 U.S.C. § 522(b)(1). "An exemption is an interest withdrawn from the estate (and hence from the creditors) for the benefit of the debtor." *Owen v. Owen*, 500 U.S. 305, 308 (1991).

Section 522(l) provides that "[t]he debtor shall file a list of property that the debtor claims as exempt under subsection (b) of this section. . . . Unless a party in interest objects, the property claimed as exempt on such list is exempt." 11 U.S.C. § 522(l). The Debtor filed his Schedule C – Property Claimed as Exempt on August 20, 2014, and elected the exemptions provided under paragraph (3) of section 522(b) of the Bankruptcy Code. *See* Schedule C – Property Claimed As Exempt [Dkt. No. 18]. Section 522(b)(3)(C) of the Bankruptcy Code exempts "retirement funds to the extent that those funds are in a fund or account that is exempt from taxation under section 401, 403, 408, 408A, 414, 457, or 501(a) of the Internal Revenue Code." 11 U.S.C. § 522(b)(3)(C). The Debtor listed the E*Trade Retirement Account as exempt in the amount of $471,000. *See* Schedule C – Property Claimed As Exempt [Dkt. No. 18].

Under Bankruptcy Rule 4003, a party in interest may object to a debtor's claim of exemption within thirty days following the conclusion of the meeting of creditors held under

23

section 341(a) of the Bankruptcy Code or within thirty days after any amendment to the list or supplemental schedules is filed, whichever is later.  Fed. R. Bankr. P. 4003.  The Debtor has not amended or supplemented Schedule C.  Failure to timely object to a claimed exemption results in a waiver of the objection. *See Taylor v. Freeland & Kronz*, 503 U.S. 638, 642-643 (1999).

The Marinis do not dispute that the Debtor claimed as exempt the funds held in the E*Trade Retirement Account.  *See* Marinis' Proposed Findings of Fact and Conclusions of Law, ¶ 14.  However, the Marinis did not object to the Debtor's claimed exemption with respect to E*Trade Retirement Account.  The section 341 meeting was held and closed on September 12, 2014.  Sept. 18, 2014 Hr'g Tr. 20:21-22.  Thus, more than thirty days has elapsed since the conclusion of the section 341 meeting and unless the Debtor amends or supplements Schedule C, the time to object to the Debtor's exemption of the E*Trade Retirement Account in this chapter 11 case has long since passed.  As a result, the asset claimed as exempt, to wit, the E*Trade Retirement Account, is excluded from the Debtor's bankruptcy estate.

Because the funds held in the E*Trade Retirement Account are claimed by the Debtor as exempt and excluded as an asset of the Debtor's bankruptcy estate, the Court is unpersuaded that a decrease in the value of the account constitutes a substantial loss to or diminution of the estate.  Any diminution in the E*Trade Retirement Account would not affect the amount available for distribution to creditors of this bankruptcy estate.

### ii.    Value of the Debtor's Interest in the Family Limited Partnerships

The Court was not presented with evidence that the value of the real property previously transferred by the Debtor to certain family limited partnerships in which he holds an interest has diminished since the filing of the chapter 11 case.  No appraisal or

other evidence of value of the real property or of the Debtor's interest in the family limited partnerships was introduced by the Marinis into evidence.  On the other hand, the Debtor testified that funds have been expended to maintain the properties (Tr. 115:18-21), the properties are insured (Tr. 115:14-16) and real estate taxes are current (Tr. 115:10-13).  Further, the MORs for August 2015 through December 2015 list the book value of the Debtor's interest in the family partnerships at $1,133,000.  [Dkt. Nos. 233, 237, 250, 251, 263, 264, and 265].  That amount is $228,000 higher than the book value listed in the MORs for the period August 2014 through July 2015. [Dkt. Nos. 29, 52, 61, 71, 107, 132, 208, 209, 210, and 214].

While the Marinis did not offer evidence to disprove the Debtor's testimony respecting upkeep of the real properties or the value of his interest in the family limited partnerships as reported in the MORs, they did call attention to the Debtor's pre-bankruptcy transfer of his interest in the real properties.   To be sure, the Court is concerned by the allegation that, prior to the Petition Date, the Debtor transferred his interest in his Residence, the Willis Avenue Property and the Bolton Landing Properties to the family limited partnerships for less than or no consideration.  That issue, however, is not before the Court.  Rather, the question before the Court is whether the Debtor's interest in the family limited partnerships and, correspondingly, the value of the real property now held by the family limited partnerships, have diminished since the Petition Date.  Absent evidence of value, the Court is unable to determine on the record before it whether any diminution has occurred.  In short, the Marinis have not offered evidence to support their claim that the values have diminished and that such diminution establishes cause to convert this case under 11 U.S.C. § 1112(b)(4)(A).

### iii.    Debtor's Cash Flow

The Marinis contend that the Debtor has negative cash flow and that the cash shortage results from both a lack of sufficient income and the Debtor's purported lavish lifestyle.  Based on the Debtor's reported income and expenses, the Marinis claim that the Debtor is running a monthly deficit of $8,201.  They reach this conclusion by first noting that the Debtor's reported monthly net income is $7,500 for each of August and September 2014.  They then deduct $15,761 of minimum monthly expenses for real estate taxes and utilities for the Debtor's residence and vacation home, tuition for his minor children, car lease payments, and credit card payments, to arrive at a cash shortfall of $8,201.  In addition, the Marinis argue that the Debtor's bank and credit card statements reveal actual monthly expense of approximately $26,354, thus creating an even larger cash shortage each month.  With equal certitude, the Debtor insists that he is cash positive on a cumulative basis and that he is meeting all of his current obligations.

The Marinis question how the Debtor is able to make up the cash shortfall and meet ongoing obligations given his reported net income. The answer, they say, lies in the Debtor's use of undisclosed assets to fund losses.  They claim that these undisclosed assets should be used to pay creditor claims rather than support the Debtor's extravagant lifestyle.  The Court will first discuss the alleged cash shortage.  Next, it will address the alleged use of undisclosed assets and the Debtor's purported lavish lifestyle.

The MORs show that the Debtor's reported net wages for the period August 2014 through December 2014 averaged $8,700 per month.  This amount dropped during the first quarter of 2015 as the MORs reflect net wages of $2,000 for January 2015 and none for

February and March 2015.[17]  The MORs also reveal that the Debtor's monthly disbursements increased from $987 for August 2014 to $40,672 for January 2015 and then ranged from $20,000 to $49,066 per month for the period February to December of 2015.  To make up the cash shortfall and pay his increased living expenses, the Debtor supplemented his wages by withdrawing funds held in the E*Trade Retirement Account.  Tr. 52:20-54:1.  As noted above, as of the Petition Date, funds in the E*Trade Retirement Account aggregated $471,000.  Schedule B [Dkt. No. 18].   By May 2015, funds held in the E*Trade Retirement Account totaled $2,000.  MOR May 2015 [Dkt. No. 218].  The Marinis argue that without funds from the E*Trade Retirement Account to supplement his income, the Debtor cannot meet his ongoing obligations, resulting in a continuing loss to the bankruptcy estate.  This, they say, establishes cause to convert the case.  The Debtor disagrees, contending that the MORs show an increase in his monthly net wages sufficient to offset any increase in his living expenses.

The MORs for the period May 2015 through December 2015 reflect aggregate net wages of $259,000.[18]  That amount averages out to $37,072 per month, a substantial increase over the amount reported in months prior to May 2015.  Overall, the MORs show that for the period August 2014 to December 2015, the Debtor's total receipts aggregate $508,887.08, including net wages of $319,400, and disbursements aggregate $444,611.06.  Thus, while it appears the Debtor has experienced negative cash flow in certain months, on a cumulative basis as reported in the MORs through December 2015 he is cash positive.

[17] The April 2015 MOR shows net wages of $14,500, a substantial increase over the prior three months, and the net wages reported for each month thereafter through December 2015 likewise reflects a substantial increase in net wages over the prior reporting period August 2014 through March 2015.

[18] The MORs for May 2015, June 2015, July 2015, August 2015 and November 2015 show net wages from Bullion Shark of $46,000, $30,000, $42,000, $47,000 and $31,500, respectively, and the MORs for September 2015, October 2015 and December 2015 reflect net wages of $21,000, $22,000, and $20,000, respectively.

The Marinis question the accuracy of the MORs claiming there is a discrepancy between the cash position set forth in the MORs and the beginning and end-of-the-month cash listed in the Debtor's bank statements. Because of this discrepancy, the Marinis contend that the MORs fail to present a clear picture of the Debtor's financial condition. The Debtor testified that the discrepancy results from the fact that the MORs report activity on a calendar month, whereas the bank statements reflect activity from the 5th or 6th day of the particular month to the 5th or 6th day of the following month. Tr. 116:23-120:10. The Marinis did not offer any evidence to refute the Debtor's explanation. The Court notes that the Debtor has since reconciled the MORs with the bank statements. Consequently, for the period June 2015 through December 2015, the beginning and end-of-the-month cash position listed in the MORs matches the cash position in the corresponding monthly bank statements. MORs June 2015 to December 2015 [Dkt. Nos. 233, 237, 250, 251, 263, 264, and 265].

Even if the MORs establish that the Debtor is cash positive and that he is able to meet ongoing obligations, the Marinis argue that the estate is suffering a substantial or continuing loss because the cash is used to maintain what they contend is an extravagant lifestyle. In support of this argument, the Marinis cite to the Debtor's country club membership, tuition costs for his minor children to attend private religious schools, and luxury car leases. The Marinis also point out that the Debtor, Lisa and four of their five children continue to reside at the Residence and should move to the smaller and presumably less expensive Willis Avenue Property to conserve resources.

The Debtor testified that he sends his children to private parochial school for religious reasons, Tr. 112:22-25, that it would be impractical to move his family of six to the Willis Avenue Property as it is zoned solely for commercial use, is 1100 square feet and has no bathtub, shower or stove, Tr. 113:11-23, and that he has reduced tuition costs for his two

older children by approximately $100,000 as they are now responsible for payment of their

respective law school tuition, Tr. 65:6-15 and 112:7-15.  As to the Debtor's country club

membership, he testified that he uses the club for business development and entertaining

clients.  Tr.:112:16-19.  As for the car leases, the Debtor testified that each lease was

entered into prior to the commencement of the chapter 11 case and he is concerned that if

he were to cancel the leases he may not have sufficient credit to lease replacement vehicles.

Tr. 113:24-114:24.  The Debtor candidly acknowledged the reasons for expending funds for

his children's religious education, the use of his country club for business related purposes,

and how unsuitable it would be for him and his family to reside at the Willis Avenue

Property.  The Marinis offered little argument to dispute the Debtor's testimony.

As to his income, the Debtor testified that he is employed by Bullion Shark, Tr.

106:24-25, and that Bullion Shark's business has improved over the last few months, Tr.

26:14-107:7-14.  Correspondingly, his aggregate wages which averaged $4,685 per month

during the first eight months of this case climbed to $14,500 in April 2015 and to $46,000 in

May 2015.[19]  DX I and J.  The Debtor's expenses have risen as well and there are several

reporting months where he is cash negative, but it appears that he is meeting his expenses,

even those characterized by the Marinis as lavish, and on a cumulative basis the MORs

show he is cash positive.

With this in mind, the question therefore naturally arises:  what is it about this

picture that the Marinis find so troubling?  The answer can be found in how they perceive

the Debtor is meeting his expenses.  The Marinis' argument focuses on the lack of

transparency in the MORs and their conclusion that the Debtor must have undisclosed

---

[19] As noted earlier, the Debtor's reported wages for the period June 2015 to December 2015 averaged $37,072 per month, a substantial increase over his reported wages during the early stages of this chapter 11 case.

assets which he is using each month to cover cash shortages caused by his purported lavish lifestyle. No evidence, however, was presented to the Court on which a determination can be made that the Debtor committed a false oath by failing to disclose assets in his bankruptcy schedules or that such undisclosed assets have been used to defray expenses.[20] The Marinis did not introduce evidence to rebut the Debtor's explanation that he was able to meet expenses because business at Bullion Shark was improving thereby resulting in a rise in his income. Nor did the Marinis offer any evidence to refute the Debtor's use of funds in his E*Trade Retirement Account to cover a cash shortage. In sum, the record lacks non-speculative evidence that the Debtor is using undisclosed assets to fund living expenses.

The Marinis also claim that the MORs are deficient in that they fail to represent a clear picture of the Debtor's financial condition. The Court recognizes that the difference between the income and disbursements reported in the MORs and that set forth in the corresponding bank statements is confusing, but observes that the Debtor has taken steps toward reconciling the MORs and his bank statements. The Court, however, takes note that in far too many instances the MORs do not provide sufficient supporting documentation, nor do they compute the Debtor's income and expenses on a cumulative basis. These shortcomings make it difficult for the reader to assess the Debtor's overall performance in this case. Creditors should not have to undertake their own mathematical computation to arrive at a snapshot of the Debtor's financial performance at any given point in time. Nevertheless, the lack of such detail does not mean the MORs are per se

---

[20] The Court surmises that the undisclosed assets the Marinis refer to consists of approximately $5 million cash they gave to the Debtor. *See* Memorandum Decision and Order dated February 6, 2014 issued in the District Court Action (Dkt. No. 234). The Debtor remains resolute in denying that he received the cash. The matter is the subject of the pending appeal and this Court will nether comment on nor address this issue.

unreliable, and no evidence was presented to the Court to that effect. Going forward, the Debtor will need to improve the quality of his reporting to assure full compliance with the U.S. Trustee's Operating Guidelines and reporting requirements.

Turning to the second prong of section 1112(b)(4)(A), i.e., "the absence of a reasonable likelihood of rehabilitation," the Marinis argue that the Debtor's chapter 11 case was filed in bad faith and solely to stay the Marinis' collection efforts on the Judgment, the Debtor has suffered a continuing loss to or diminution of the estate, and the Debtor has yet to file a plan of reorganization and disclosure statement. This, they contend, shows that the Debtor has no intention of seeking, nor a reasonable likelihood of, rehabilitation.

As set forth above, to demonstrate "cause" under section 1112(b)(4)(A), there needs to be both (i) a substantial or continuing loss to or diminution of the bankruptcy estate and (ii) the absence of a reasonable likelihood of rehabilitation. Because the Court has determined that the Marinis have failed to demonstrate by a preponderance of the evidence that the Debtor has suffered a substantial or continuing loss to or diminution of the estate, the Court need not address whether there is "no reasonable likelihood of rehabilitation." 11 U.S.C § 1112(b)(4)(A).

### B.    Failure to File A Disclosure Statement, or to File or Confirm A Plan, Within the Time Fixed by This Title or by Order of the Court under Section 1112(b)(4)(J)

Under section 1112(b)(4)(J) of the Bankruptcy Code, "cause" to convert or dismiss a chapter 11 case exists if a debtor fails to file a disclosure statement, or to file or confirm a plan, within the time periods fixed by the Bankruptcy Code or by order of the court. 11 U.S.C. § 1112(b)(4)(J). The Marinis assert that the Debtor has failed to file a plan within the 120 day time period found in sections 1121(b) and (c)(2) of the Bankruptcy Code. Motion, at 4. This, they contend, establishes cause to convert this case under 11 U.S.C. § 1112(b)(4)(J). The Court disagrees.

First, the Court has not entered an order fixing a deadline by which the Debtor must file a disclosure statement or plan.  Second, only a small business debtor is subject to deadlines fixed under the Bankruptcy Code for filing a disclosure statement, filing a plan, and confirming a plan.  *See* 11 U.S.C. § 1121(e)(2) and (3) (a small business debtor must file a plan and disclosure statement no later than 300 days after the date of the order for relief, unless an extension is granted prior to the expiration of the existing deadline) and 11 U.S.C. § 1129(e) (a small business debtor must confirm a plan not later than 45 days after the plan is filed, unless the time is extended by court order).  Here, the Debtor is not a small business debtor[21] and is therefore not constrained by the deadlines fixed under the Bankruptcy Code for filing a disclosure statement, filing a plan, and confirming a plan. Accordingly, the Marinis have failed to establish "cause" under 11 U.S.C. § 1112(b)(4)(J).

However, in the interest of completeness, the Court will address the argument made by the Marinis that the failure of the Debtor to file a disclosure statement and plan within the 120 day time period set forth in section 1121(b) and (c)(2) constitutes cause to convert this case.

A chapter 11 debtor can file a plan at any time.  11 U.S.C. § 1121(a).  A party other than the debtor cannot file a plan unless a trustee is appointed, or the debtor fails to file a plan within 120 days after the date of the order for relief, or unless the debtor fails to obtain acceptance of its plan from each class of each class of claims or interests that is impaired under the plan within 180 days after the date of the order for relief.  11 U.S.C. §§ 1121(b) and (c).  The 120 day and 180 day "exclusivity periods" can be reduced or extended by court order for cause shown.  Any extension of the 120 day exclusivity period and the 180 day exclusivity period may not exceed 18 months and 20 months, respectively.  11 U.S.C.

---

[21] A "small business debtor" is defined in 11 U.S.C. § 101(51D).

§ 1112(d).

The Debtor did not file a plan before the expiration of the 120 day exclusivity period,[22] nor did he seek to extend the exclusive period.  Nevertheless, under section 1121(a), the Debtor at any time is permitted to file a chapter 11 plan provided he is not a small business debtor or a deadline has not been fixed by order of the Court.  As noted above, the Debtor is not a small business debtor as that term is defined in 11 U.S.C. § 101(51D), and an order has not been entered by the Court fixing the time by which the Debtor must file a disclosure statement and plan.  The failure of a debtor to file a plan during the 120 day exclusivity period is not a ground for conversion. *See Theatre Holding Corp. v. Mauro,* 681 F.2d 102, 104 n.4 (2d Cir. 1982) (*citing In re Manzey Land & Cattle Co.,* 17 B.R. 332, 338 (Bankr. D.S.D. 1982)). *See also In re McIntosh & Co., Inc.*, No. 90-2155-WH, 1991 WL 11731157, at *4 (Bankr. S.D. Iowa Apr. 5, 1991).

### C.    *Additional Ground for Conversion Asserted by Marinis*

In their reply memorandum the Marinis raise, for the first time, that grounds exist to convert this case because the Debtor filed his chapter 11 petition in bad faith as evidenced by his postpetition conduct.  The Court need not consider a new argument made for the first time in a reply brief. *In re Jensen,* No. 09-14830 (MG), 2010 WL 424693, at *2 (Bankr. S.D.N.Y. Feb. 3, 2010) (*citing Ernst Haas Studio, Inc. v. Palm Press, Inc.*, 164 F.3d 110, 112 (2d Cir. 1999)); *Int'l Elecs., Inc. v. Media Syndication Global, Inc.*, No. 02 Civ. 4274 LAK, 2002 WL 1897661, at *3 n.2 (S.D.N.Y. Aug. 17, 2002) ("Arguments first advanced in reply memoranda are not properly considered").  New arguments raised in reply briefs deny the opposing party an opportunity to properly respond to such arguments. *U.S. Underwriters Ins. Co. v. Falcon Constr. Corp.*, No. 02-CV-4182 (CSH), 2006 WL 3146422, at

---

[22] The Debtor's 120 day exclusivity period ended on December 4, 2014.

*3 (S.D.N.Y. Oct. 30, 2006).  Accordingly, the Marinis' bad faith filing argument will not be considered by the Court.[23]

### D.    Issues Raised by the U.S. Trustee

At the Evidentiary Hearing, the U.S. Trustee stated several bases for conversion of this case.  The U.S. Trustee, however, did not file a separate motion to convert the case nor did it file papers in support of the Motion.  As such, the Debtor, was unable to address in advance of the Evidentiary Hearing unanticipated arguments made by the U.S. Trustee.  Generally, courts will not consider arguments made for the first time at a hearing.  *United States v. Barnes*, 158 F.3d 662, 672 (2d Cir. 1998) (noting that courts normally will not consider arguments raised for the first time at oral argument); *Goldberg v. UBS AG*, 690 F. Supp.2d 92, 99 (E.D.N.Y. 2010); *In re Monster Worldwide, Inc. Sec. Litig.*, 251 F.R.D. 132, 137 (S.D.N.Y. 2008) (finding that an argument was raised for the first time at oral argument and so was waived in terms of the motion).  That said, the Court recognizes that the arguments raised by the U.S. Trustee were likewise advanced by the Marinis in support of their motion to convert this case, namely, (i) the Debtor's use of funds held in the E*Trade Retirement Account, (ii) the pre-petition transfers of the Debtor's interest in certain real property, (iii) the apparent lack of transparency in the Debtor's financial reports, (iv) the filing of a plan and disclosure statement, and (v) the likelihood of the Debtor confirming a plan.  These issues were considered by the Court, *supra*, in reaching its determination not to convert the case at this time and need not be addressed again.

---

[23] The Court notes that the Motion seeks conversion of this case, not dismissal.  Dismissal is generally the remedy sought for a bad faith filing as the allegation centers on the very filing itself, i.e., that the chapter 11 petition was improper in the first instance. *C-TC 9th Ave. P'ship,* 113 F.3d at 1310.

### E.     Failure to Timely File Operating Reports

In their proposed findings of fact and conclusions of law, the Marinis raised as cause to convert this case the failure by the Debtor to timely file monthly operating reports as required under the applicable rules.  This ground for conversion, however, was not asserted in the Motion nor advanced at the Evidentiary Hearing.  Accordingly, the untimely filing of the MORs has not been considered by the Court as a ground to convert the case at this time.  The Court, however, is troubled by the Debtor's untimely filing of the MORs.

Section 1112(b)(4)(F) of the Bankruptcy Code provides that "cause" to dismiss or convert a chapter 11 case includes the "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter."  11 U.S.C. § 1112(b)(4)(F).

This district's Local Bankruptcy Rule 2015-1 requires the chapter 11 debtor to file a verified monthly report by no later than the 20th day of each month, and the "[f]ailure to file the required reports may constitute cause for dismissal or conversion of the case."  E.D.N.Y. LBR 2015-1.  The monthly reports are to be filed in the manner prescribed by the U.S. Trustee's Operating Guidelines.  E.D.N.Y. LBR 2015-1.  The U.S. Trustee's Operating Guidelines, *inter alia*, states that the monthly operating reports must be filed by the 20th day of the month following the reporting period, which is the calendar month preceding the due date.  In addition to the requirement set forth in the Local Bankruptcy Rules and the U.S. Trustee's Operating Guidelines for the filing of monthly operating reports, the Order Scheduling Initial Case Conference, dated August 7, 2014, entered by the Court in this chapter 11 cases provided that:

> ORDERED, that the Debtor shall file with the Court, and serve upon the Office of the United States Trustee, monthly operating reports during the pendency of this case; that the operating reports shall be in the form

> prescribed by the Office of the United States Trustee's Operating Guidelines
> and Reporting Requirements for Debtors-in-Possession and Trustees for cases
> pending in this District; and that the operating reports shall be served and
> filed on or before the 20th day of the month following the reporting period,
> and it is further
>
> ORDERED, that unexcused failure to comply with the foregoing paragraphs
> of this Order may constitute cause for conversion of this case to Chapter 7 or
> dismissal of this case pursuant to 11 U.S.C. § 1112 . . . .

[Dkt. No. 8].

As noted by the court in *Kholyavka*, even before section 1112 was amended by Congress in 2005 to expressly include the failure to timely file operating reports as cause under section 1112(b), courts routinely converted or dismissed a chapter 11 case where debtors failed to discharge their obligation to timely file such reports.  No. 08–10653DWS, 2008 WL 3887653, at *4.

> Monthly operating reports "are much more than busy work imposed upon a
> Chapter 11 debtor for no reason other than to require it do something." *In re
> Berryhill*, 127 B.R. 427, 433 (Bankr. N.D. Ind. 1991).  They are "the life
> blood" of chapter 11, enabling creditors to keep tabs on the debtor's post-
> petition operations.  *Id.*  Failure to file them – and file them timely – is a
> serious breach of the debtor's fiduciary obligations and "undermines the
> chapter 11 process."  *All Denominational New Church*, 268 B.R. 536, 538
> (B.A.P. 8th Cir. 2001).

*Id.* (*quoting In re Rey*, No. 04 B. 35040, 2006 WL 2457435, at *8 (Bankr. N.D. Ill. Aug. 21, 2006)).  *See also In re Whetten*, 473 B.R. 380, 383-84 (Bankr. D. Colo. 2012) (finding cause under section 1112(b)(4)(F) where the debtor failed to timely file the monthly operating reports and the reports that were filed were not compete and accurate); *Babayoff*, 445 B.R. at 81 (finding cause to convert or dismiss under section 1112(b)(4)(F), among other things, where the debtor failed to file monthly operating reports with the court or filed them in a single batch, weeks or months late).

Here, the Debtor has consistently failed to file filed the MORs on time. Of the seventeen MORs filed since the Petition Date, only two (August 2014 and October 2014)

have been filed by the applicable deadline; the other fifteen were filed late and often times

in batches months after the deadline had elapsed as set forth below:

| Reporting Period | Date Filed[24] (Dkt. No.) |
|---|---|
| Aug. 2014 | Sept. 16, 2014 (29) |
| Sept. 2014 | **Oct. 21, 2014** (52) |
| Oct. 2014 | Nov. 20, 2014 (61) |
| Nov. 2014 | **Dec. 23, 2014** (71) |
| Dec. 2014 | **Jan. 30, 2015** (107) |
| Jan. 2015 | **Mar. 9, 2015** (132) |
| Feb. 2015 | **June 19, 2015** (208) |
| Mar. 2015 | **June 19, 2015** (209) |
| Apr. 2015 | **June 19, 2015** (210) |
| May 2015 | **June 24, 2015** (214) |
| June 2015 | **July 31, 2015** (233) |
| July 2015 | **Sept. 9, 2015** (237) |
| Aug. 2015 | **Oct. 29, 2015** (250) |
| Sept. 2015 | **Nov. 6, 2015** (251) |
| Oct. 2015 | **Feb. 4, 2016** (263) |
| Nov. 2015 | **Feb. 4, 2016** (264) |
| Dec. 2015 | **Feb. 4, 2016** (265) |

The MOR for January 2016 was due February 20, 2016.  Consistent with the

Debtor's pattern of behavior in this case, it has yet to be filed.  As noted earlier, section

1112(b)(4)(F) provides that "cause" to dismiss or convert a chapter 11 case is established by

an "unexcused failure to satisfy timely any filing or reporting requirement."  11 U.S.C.

§ 1112(b)(4)(F).  Should the Debtor's untimely filing of the MORs be properly raised and

come before the Court for ruling, the Debtor will be given an opportunity to explain why his

operating reports have not been filed by the applicable deadline imposed under E.D.N.Y.

LBR 2015-1, the U.S. Trustee's Operating Guidelines and the August 7, 2014 Order of this

Court.

---

[24] Late MORs filing indicated in bold.

## VII.    Conclusion

For the foregoing reasons, the Court concludes that cause has not been established for conversion at this time.  Accordingly, the Motion is denied.

IT IS SO ORDERED.



**Dated: March 4, 2016**
**Central Islip, New York**

_Louis A. Scarcella_
**Louis A. Scarcella**
**United States Bankruptcy Judge**